# In the United States Court of Federal Claims

No. 22-292C (consolidated with 22-317C)
Filed: October 28, 2022
Reissued: November 15, 2022[†]

---

**CONNECTED GLOBAL SOLUTIONS, LLC,**

        *Plaintiff,*

*and*

**AMERICAN ROLL-ON ROLL-OFF CARRIER GROUP INC.,**

        *Plaintiff,*

**v.**

**THE UNITED STATES,**

        *Defendant,*

*and*

**HOMESAFE ALLIANCE, LLC,**

        *Intervenor-Defendant.*

---

*James Y. Boland,* Venable LLP, Tysons, Virginia, with *Michael T. Francel*, *Christopher G. Griesedieck*, *Taylor A. Hillman*, *Lindsay M. Reed*, and *Allison M. Siegel*, of counsel, for Connected Global Solutions, LLC.

*Kara M. Sacilotto*, Wiley Rein, LLC, Washington D.C., with *Trayce Winfrey Howard*, *Gary S. Ward*, *Cara L. Lasley*, *Jennifer Eve Retener*, *Teresita A. Regelbrugge*, of counsel, for American Roll-On Roll-Off Carrier Group Inc.

---

[†] This Opinion was originally issued under seal, (ECF No. 107), and the parties were directed to file a notice of redactions consistent with the Court's instructions. That Notice was filed on November 14, 2022. (ECF No. 109). There is disagreement among the parties as to redactions, but there is no related motion. The Court accepts all proposed redactions and notes that most are identical to those proposed in prior Orders with no objection. The sealed and public versions of this Opinion differ only to the extent of those redactions, the publication date, and this footnote.

*Elizabeth Anne Speck*, Trial Attorney, Commercial Litigation Branch, Civil Division, *Douglas K. Mickle*, Assistant Director, *Patricia McCarthy*, Director, *Brian M. Boynton*, Principal Deputy Assistant Attorney General, with *Miles K. Karson*, U.S. Department of Justice, Washington, D.C.; *Robert J. Depke*, *Todd P. Federici*, *Adam J. Koudelka*, *Peter B. Ries*, Attorney-Advisers, Office of the Staff Judge Advocate, United States Transportation Command; *Erika Whelan Retta*, Chief Bid Protests, *Aaron Weaver*, Trial Attorney, Commercial Litigation Field Support Center, Judge Advocate General's Corps, United States Air Force, Joint Base Andrews, Maryland, for United States.

*Craig A. Holman*, Arnold & Porter Kaye Scholer LLP, Washington D.C., with *Stuart W. Turner*, *Sonia Tabriz*, *Amanda J. Sherwood*, *Thomas A. Pettit*, *Trevor Schmitt*, and *Nicole Williamson*, of counsel, for HomeSafe Alliance, LLC.

## MEMORANDUM OPINION AND ORDER

**TAPP, Judge.**

"Perfection is the enemy of progress," [1] an adage aptly describing many aspects of the government procurement process. The search for a perfect procurement, proposal, or even performance would be in vain. Arbiters are tasked with deciding whether protested procurements pass muster; accepting less violates the law and disregards notions of transparency and fairness. Requiring more is likewise infeasible; it impairs government agencies, awardees, and ultimately taxpayers. It is within these parameters that the Court decides whether the United States has acted arbitrarily, capriciously, or in violation of the law in conducting the subject procurement.

In this post-award bid protest, Connected Global Solutions, LLC ("CGSL") and American Roll-On Roll-Off Carrier Group Inc. ("ARC") contest the Department of Defense's ("DoD") award of a household goods transportation contract for certain members of the United States military and their families. The DoD planned to transition all military members' permanent change-of-station moves to a single managed service provider rather than contracting with companies on a move-by-move basis as it does today. In November of 2021, the awarding agency, United States Transportation Command ("the Agency" or "TRANSCOM"), finally awarded the contract to HomeSafe Alliance, LLC ("HomeSafe"). In addition to this litigation, the peregrination of this award has encompassed more than two years and two stops at the Government Accountability Office ("GAO"), as well as intensive corrective action by the Agency.

After considering its litigious history, as well as the litany of arguments put forth by the parties, the Court finds that the parties have not met their burden to justify disturbing the award. CGSL's and ARC's Motions for Judgment on the Administrative Record, (CGSL MJAR, ECF No. 62; ARC MJAR, ECF No. 61), are denied. The United States and HomeSafe's Motions for

---

[1] This quote is attributed to Winston Churchill. It is thought to have been delivered during an October 11, 1952 speech to the Conservative Party Conference, though no transcript of the speech exists.

Judgment on the Administrative Record, (USA MJAR, ECF No. 74; HomeSafe MJAR, ECF No. 75), are granted.

## I.    Background

TRANSCOM is one of eleven unified combatant commands of the DoD. *About USTRANSCOM*, USTRANSCOM, https://www.ustranscom.mil/cmd/aboutustc.cfm (last visited Oct. 1, 2022). On September 13, 2019, TRANSCOM issued a Request for Proposals ("RFP") seeking a qualified contractor to perform the Global Household Good Relocation Contract ("GHC"); this contract provides comprehensive household goods relocation services for DoD service members, DoD civilians, and U.S. Coast Guard members. (*See* Administrative Record,[2] Tab 7 at AR121; Tab 7b1 at AR461–462; Tab 134b1 at AR21077). The procurement is lucrative—worth up to $17.9 billion should the DoD exercise all contract options over the next nine years. The GHC is the first time that the DoD has consolidated management of the entire relocation process for DoD families into a single contract. (*See* Tab 118 at AR19454).

The RFP subject to this litigation sought a single indefinite delivery, indefinite quantity contract after the Agency conducted discussions with offerors whose proposals were within the competitive range. (Tab 7 at AR135). This limited competition to three offerors—CGSL, ARC, and HomeSafe. TRANSCOM advised each offeror that they must represent the best value to the Agency, price and other factors considered. (*Id.*). TRANSCOM informed offerors that this may "result in an award to a higher rated, higher priced Offeror" where the decision was "consistent with the evaluation factors and the Source Selection Authority (SSA) reasonably determined that the superior technical capability" outweighed the cost difference. (*Id.*).

The RFP required offerors to submit proposals in four volumes corresponding to four evaluation factors: (1) Business Proposal; (2) Technical Capability (rated); (3) Past Performance; and (4) Price (assessed for fairness, reasonableness, completeness, and balance). (Tab 7 at AR135, AR197; Tab 134 at AR21030–31). In the "[r]elative order of importance[,]" the RFP stated that an offeror's Technical Capability would be evaluated on a basis approximately equal to price. (Tab 7 at AR135). Technical Capability had four equally weighted subfactors ("SF"): (1) operational approach (SF 1); (2) capacity and subcontractor management (SF 2); (3) transition/volume phase-in (SF 3); and (4) information technology ("IT") services (SF 4). (Tab 7 at AR199–201). Each SF was "of equal importance." (*Id.*).

TRANSCOM provided a technical rating for each Technical Capability SF. (AR136). The technical ratings were based on the offeror's approach and understanding of the requirements and assessment of strengths, weaknesses, significant weaknesses, and deficiencies of the proposal. (*Id.*). The Agency rated Technical Capabilities as either Outstanding, Good, Acceptable, Marginal, or Unacceptable and explained how strengths, weaknesses, significant weaknesses, and deficiencies would be evaluated. (*Id.*). TRANSCOM further advised that after

---

[2] The Administrative Record could not be uploaded to the CM/ECF System; it was filed with the Clerk's Office in physical media format. (*See* ECF No. 59). Thus, there is no ECF Number assigned to the record. Further, The Administrative Record is consecutively tabbed and paginated, thus the Court will cite to the record using ("Tab ___ at AR___").

assigning technical ratings, it would assign a technical risk rating for each SF. (*Id.* at AR136–137).

Concerning Factor 4, the Agency advised offerors that price would be evaluated for completeness, but not rated. (AR138). TRANSCOM informed offerors that to be considered for award, the offeror's total evaluated price must be determined to be fair and reasonable. (*Id.*).

In Spring of 2020, TRANSCOM awarded the contract to ARC; in response, CGSL and HomeSafe filed protests with the GAO. (*See* Tab 80). After TRANSCOM took corrective action to address ARC's responsibility, it re-awarded the contract to ARC and, in July 2020, both CGSL and HomeSafe re-filed their protests. (*See* Tab 118 at AR19453; Tab 133 at AR20987). On October 21, 2020, the GAO sustained both protests, finding, *inter alia*, that TRANSCOM conducted an insufficient responsibility determination regarding ARC, failed to adequately document oral presentations, did not "provide CGSL an opportunity to address the [A]gency's perception" of a deficiency in the presentation in the subsequent discussions, and conducted an unreasonable and unequal technical evaluation and flawed best value tradeoff. (*See* Tab 118).

In response to the GAO's decisions recommending that TRANSCOM conduct a new technical evaluation and best value tradeoff analysis, the Agency took corrective action. (*See id.*; Tab 133). Notably, "the evaluation team was restaffed with new members and specifically advised not to consider the previous technical evaluation, to the point that the technical team did not have access to any previous source selection documentation." (Tab 269.236 at AR58106; *see also* Tab 258 at AR37642).

During renewed evaluations, the Source Selection Evaluation Board ("SSEB")[3] documented whether each proposal demonstrated an adequate, thorough, or exceptional "approach and understanding," detailing for each Performance Work Statement ("PWS") requirement the responsive portions of the proposal and the team's reasoning for the assigned approach rating. (Tabs 198c–f, 198j–m, and 198p–s). The SSEB examined strengths, weaknesses, significant weaknesses, deficiencies, and discussion items assigned to each offeror under each subfactor. (*Id.*).

The Source Selection Advisory Council ("SSAC") examined the SSEB's 1000-page report and conducted an independent comparative analysis of each offeror. (Tab 200 at AR34285–91 (comparing ARC and CGSL), AR34465–72 (comparing ARC and HomeSafe), AR34644–52 (comparing HomeSafe and CGSL)). Based on this analysis, the SSAC concluded that HomeSafe's proposal offered the best value to the Agency. (*Id.* at AR34652–53). The SSA, in turn, reviewed both reports and issued its independent best value determination in the Source

---

[3] Under DoD Source Selection Procedures ("SSP") the SSEB "evaluate[s] proposals 'related to technical and risk matters.'" (Tab 263 at AR38072; *see also* Tab 2c at AR105). The SSAC "provide[s] a written comparative analysis of proposals and an award recommendation in an SSAC report for the SSA's consideration." (Tab 2c at AR104). The SSA performs an "independent assessment" to determine the best value in which it "compar[es] the strengths, weaknesses, and the cost/price of the competing proposals to determine which proposal represents the best value to the Government." (*Id.*).

Selection Decision Document ("SSDD"). (Tab 201 at AR34654.) The SSA agreed with the following ratings assigned to the three remaining offerors:

| | Subfactor | Offeror | Strengths | Thoroughness Findings | | | Subfactor Ratings | |
| | | | | Adequate | Thorough | Exceptional | Adjectival | Risk |
|---|---|---|---|---|---|---|---|---|
| 1 | Operational Approach | ARC | 15 | 18 | 14 | 6 | Good | Low |
| | | CGSL | 11 | 28 | 9 | 1 | Acceptable | Low |
| | | HomeSafe | 7 | 32 | 6 | 0 | Acceptable | Low |
| 2 | Capacity & Subcontractor | ARC | 3 | 3 | 2 | 0 | Acceptable | Low |
| | | CGSL | 1 | 5 | 0 | 0 | Acceptable | Low |
| | | HomeSafe | 2 | 3 | 1 | 1 | Good | Low |
| 3 | Transition/Volume Phase-In | ARC | 1 | 10 | 1 | 0 | Acceptable | Low |
| | | CGSL | 1 | 10 | 1 | 0 | Acceptable | Low |
| | | HomeSafe | 0 | 10 | 1 | 0 | Acceptable | Low |
| 4 | IT Services | ARC | 1 | 15 | 1 | 0 | Acceptable | Low |
| | | CGSL | 4 | 9 | 7 | 0 | Acceptable | Low |
| | | HomeSafe | 5 | 7 | 8 | 1 | Good | Low |

(*Id.*).

CGSL had the lowest price at $17,684,158,550.47, HomeSafe the next lowest price at $17,908,768,040.96, and ARC the highest price at $19,533,278,941.16; all prices were found to be fair and reasonable. (*Id.*). As to the equally weighted technical subfactors, the SSA agreed with the following ratings assigned to the three remaining offerors:

| Offeror | Business Proposal Rating | Operational Approach Technical Sub-factor 1 | | | Capacity & Sub Mngt Technical Sub-factor 2 | | | Transition/Volume Phase-In Technical Sub-factor 3 | | | IT Services Technical Sub-factor 4 | | | Past Perf Rating | Total Evaluated Price (TEP) |
| | | Color Rating | Adjectival Rating | Risk Rating | Color Rating | Adjectival Rating | Risk Rating | Color Rating | Adjectival Rating | Risk Rating | Color Rating | Adjectival Rating | Risk Rating | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ARC | A | | Good | Low | | Acceptable | Low | | Acceptable | Low | | Acceptable | Low | A | $19,533,278,941.16 Fair & Reasonable |
| CGSL | A | | Acceptable | Low | | Acceptable | Low | | Acceptable | Low | | Acceptable | Low | A | $17,684,158,550.47 Fair & Reasonable |
| HomeSafe | A | | Acceptable | Low | | Good | Low | | Acceptable | Low | | Good | Low | A | $17,908,768,040.96 Fair & Reasonable |

A = Acceptable; U = Unacceptable

(Tab 200 at AR34112).

After the SSAC conducted a comparative analysis, the SSA issued the SSDD in which he concluded that CGSL and HomeSafe's proposals were the most competitive. (Tab 201 at AR34656). The SSA concluded that, while CGSL had the lower-priced proposal, HomeSafe had the higher-rated technical proposal. (*Id.*). Based on a best value tradeoff analysis, the SSA determined that HomeSafe's proposal represented the best value to the Government. (*Id.* at AR34673). In November 2021, TANSCOM awarded HomeSafe the GHC. (Tab 205 at

AR35238). Following the award, CGSL and ARC filed protests at the GAO, which the GAO denied. (Tabs 251, 267). This litigation ensued.

## II.    Analysis

### A.   Standard of Review

According to 28 U.S.C. § 1491(b)(4), the Court reviews agency procurement decisions under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. Under the APA standard, "[i]n a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial." *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013). Thus, judicial review of agency action under the APA proceeds on two tracks: the Court could find (1) the agency's decision lacked either a rational basis or support from the administrative record or was arbitrary and capricious; and/or (2) the agency's procurement procedure involved a violation of regulation or statute. *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009). To obtain relief, after showing that the procuring agency violated the law or acted arbitrary and capriciously, the protestor must show that the agency's violation was prejudicial to the protestor. *Glenn Def. Marine*, 720 F.3d at 907.

"Under the 'arbitrary and capricious' standard[,] the scope of review is a narrow one. A reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974) (internal quotations omitted). The Court may not substitute its own judgment for that of the agency. *Id.* But the agency must articulate a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962).

Unlike the standard applied in summary judgment motions, "the existence of genuine issues of material fact does not preclude judgment on the administrative record" under RCFC 52.1. *Tech. Sys., Inc. v. United States*, 98 Fed. Cl. 228, 242 (2011); *see also* RCFC 56. Rather, the Court's inquiry is whether, "given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *A&D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006) (citing *Bannum Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005)). Taken together, the standards for success by a plaintiff are substantial.

### B.   Discussion

Each Plaintiff serves a litany of arguments purporting TRANSCOM's award to HomeSafe was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. (*See generally* CGSL MJAR; ARC MJAR). In sum, Plaintiffs argue that: (1) TRANSCOM should not have replaced certain portions of its prior evaluation; (2) TRANSCOM's discussions with offerors were misleading and unequal; (3) TRANSCOM unfairly and irrationally evaluated the parties' proposals; (4) TRANSCOM's best value tradeoff analysis was irrational; (5) HomeSafe's proposal contained material misrepresentations necessitating disqualification of its bid; (6) TRANSCOM's price analysis was based on disqualified bids and therefore irrational; and (7) TRANSCOM irrationally evaluated HomeSafe's responsibility. Based on these

arguments, CGSL and ARC argue that these purported errors amount to violations of the Federal Acquisition Regulations ("FAR") and Competition in Contracting Act, 41 U.S.C. § 253; that those violations prejudiced them; that TRANSCOM's errors breached the duty to consider the proposals honestly and fairly; and that, as a result, they are entitled to a permanent injunction. The Court addresses each argument in turn.

Ultimately, neither ARC nor CGSL successfully identify any basis to overturn TRANSCOM's technical evaluation or award to HomeSafe. The protestors' claims before this Court fail to satisfy their "heavy burden" of proving the decision lacked a rational basis or was contrary to law. *See KSC Boss All., LLC v. United States*, 142 Fed. Cl. 368, 380 (2019) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1338 (Fed. Cir. 2001)). Thus, based on the analysis below, the Court will not disturb the United States' award decision.

i. <u>TRANSCOM did not err when it did not explain departure from prior strengths assigned to CGSL.</u>

CGSL argues that TRANSCOM failed to explain why it replaced portions of its prior evaluations assigned during the ARC award, something not recommended by the corrective action prescribed by the GAO.[4] (CGSL 12–17; *see also* Tr. Or. Arg. at 12:21–23; Tab 267). In 2020, TRANSCOM assigned CGSL's proposal 26 strengths across the Technical Capability subfactors. (Tab 58a1 (2020 strengths)). In 2021, after the GAO recommended some level of reconsideration, TRANSCOM conducted a new evaluation that departed from its earlier assessment, resulting in the assignment of only 17 strengths. (*Compare* 2020 strengths, *with* Tab 193a1 (2021 strengths)). CGSL argues that deviation would only be justified if the Record showed: (1) the RFP's definition of "strength" changed during the reevaluation; (2) the Agency changed its methodology for determining what proposal elements warranted a strength; or (3) the Agency's original assessment of strengths in CGSL's proposal was unreasonable or unsupported. (CGSL MJAR at 15). CGSL maintains that the Record exhibits nothing of the sort, and neither explains nor supports TRANSCOM's departure from its previous factual determinations. (*Id.*).

The GAO recommended that TRANSCOM reevaluate proposals after identifying errors committed in the prior award to ARC but was silent as to what reevaluation would look like. (*See* Tab 267). In response, TRANSCOM took corrective action by revising the RFP, soliciting revised proposals, empaneling and training a new technical evaluation team, comprising some new members and prior members of the original evaluation team, conducting an entirely new evaluation, performing new discussions with offerors, and making a new source selection decision. (*See* Tab 269.236 at 58106). TRANSCOM informed the SSEB, a panel comprised of 70% of the same individuals from the 2020 Evaluations, that it was "specifically advised not to consider the previous technical evaluation[;]" the new team had no access to any prior documentation relating to its earlier recommendation. (*Id.*; *see also* TAB 258a at AR37644). In

---

[4] The Court acknowledges that CGSL does not assert that the United States was bound by its previous determinations in that it was not permitted to stray from them. (*See* Tr. Or. Arg. 12:6–10). This analysis is based upon whether the United States can be required to explain deviation from those prior determinations.

its latest iteration, the SSEB assigned fewer strengths to each offeror than were assigned in the first evaluation. (*Compare* Tab 68 at AR15670 with Tab 198p at AR32074–76; Tab 198q at AR32220–21; Tab 198r at AR32268–69; Tab 198s at AR32328–30; Tab 194).

The United States argues that, given the GAO's decisions recommending a new technical evaluation as well as the Agency's conclusions from its internal review, it was reasonable for the Agency to conduct a comprehensive reevaluation, including the assignment of strengths. (*Id.*). The Court agrees that TRANSCOM acted within its discretion assigning reevaluation of all proposals and did not err when it failed to further elaborate on departure from prior strengths assigned to CGSL. Further, CGSL was not prejudiced because each offeror received fewer strengths than they did in the earlier 2020 evaluation.

"[A]n agency has the discretion to re-evaluate proposals during a corrective action and to correct prior evaluation errors." *Sotera Def. Sols., Inc. v. United States*, 118 Fed. Cl. 237, 262 (2014). Agency evaluators must be "allowed the discretion to review their own conclusions if they conclude a mistake has been made, or if further inquiry appears appropriate, provided the re-evaluation conforms with the solicitation," and "the evaluation process is conducted in a manner fair to all offerors." *Glenn Def. Marine (Asia), PTE Ltd. v. United States*, 105 Fed. Cl. 541, 569 (2012), *aff'd*, 720 F.3d 901 (Fed. Cir. 2013). That said, agency discretion "does not relieve the agency of its obligation to develop an evidentiary basis for its findings." *FCN, Inc. v. United States*, 115 Fed. Cl. 335, 368 (2014).

To support its claims, CGSL cites *F.C.C. v. Fox Television Stations, Inc.* for the proposition that "the requirement that an agency provides reasoned explanation for its action would ordinarily demand that it display awareness that it is changing position." 556 U.S. 502, 515 (2009). CGSL inappropriately applies precedent involving agency rulemaking to the bid protest context. Relying on the Supreme Court's decision in *F.C.C. v. Fox,* CGSL declares the Agency was bound to its previous "factual findings" and lacking a "reasoned explanation for" reaching a different conclusion. *Id.* at 515–37. The Court of Federal Claims rejected a similar argument in *Ultra Electronics Ocean System Inc. v. United States*, holding that "decisions of contracting officers are fundamentally different from the decisions reached in agency rulemaking proceedings and adjudications that are the subject of APA review" and that "contracting officers have no obligation to explain or distinguish past procurement decisions when making determinations under new procurements." 139 Fed. Cl. 517, 531 (2018). Here, TRANSCOM conducted a new evaluation and advised the evaluators "not to consider the previous technical evaluation." (Tab 269.236 at AR58106). No evidence exists to suggest that the evaluators disregarded this instruction or that it was not conducted in a manner fair to all offerors.

In support of its position, the United States cites *DHS v. Regents of the University of California.* 40 S. Ct. 1891, 1907 (2020). Although *Regents* is not a bid protest, its logic is more applicable here. As explained in *Regents*, when a court remands a matter, the agency can either elect to provide further explanation and clarification for the reasoning contained in prior evaluations, or it can examine the issue "afresh" and take new action. *Id. (see also* Tr. Oral Arg. at 12–17 (DOJ Counsel: "Why would [the Agency] want to consider a prior flawed evaluation if it's doing an entirely new technical[] analysis; it's empaneling a new team; it's conducting a new SSA; the SSAC is creating a new report; and the SSA is conducting a new best value tradeoff decision?")). While it is true the reevaluation was based on the GAO's recommendation and not

a court's remand, similar reasoning prevails despite the distinction between an agency decision and a court's remand. TRANSCOM's reevaluation of the proposals entirely is tantamount to examining the issue afresh.

When an agency takes new action, as TRANSCOM did here, the United States argues persuasively that it "is not limited to its prior reasons." (USA MJAR at 6). The Agency can correctly assume that if it committed error in evaluating the proposal of one offeror, that error was likely repeated in evaluating the offers of its cohort. And if an agency is not bound by a decision, failure to address each departure from prior findings is not error when the record clearly shows that it was warranted. The Contracting Officer's ("CO") statement of facts shows that the Agency wanted to ensure the SSEB was equipped with proper tools because of the concern that Agency incorrectly evaluated technical factors. (Tab 258A at AR37642–44). It is evident from the Record why TRANSCOM did not want to reimplement prior findings, and the United States has not shied from admitting that the prior evaluation was fundamentally flawed. (*See* Tr. Or. Arg. at 58:13–15 (The Court: "That sounds like the United States is throwing the first SSEB under the bus." DOJ Counsel: "Yes, I am.")).

Although a reviewing court "may not supply a reasoned basis for the agency's action that the agency itself has not given," a decision that is not fully explained may, nevertheless, be upheld "if the agency's path may reasonably be discerned." *Bowman Transp., Inc.*, 419 U.S. at 285–86 (citation omitted). Rather than risk growing additional tainted fruit, TRANSCOM chose to plant a new tree (albeit on the same property). This is not something that the Court can reasonably fault TRANSCOM for. As a matter of public policy, the Court would rather commend agencies for thorough corrective action. Stated differently, based on the Record before the Court, it was enough for the Agency to say that corrective action was necessary and then explain that it would be conducting an entirely new evaluation. It is inapposite to require an agency to explain how its new findings relate to its previous findings when the Record establishes that errors occurred. The Agency's admission, coupled with restaffing and retraining the SSEB, demonstrates that TRANSCOM believed that the evaluations were done incorrectly on a larger scale.

CGSL fails to establish that it was prejudiced by these ratings. First, it does not effectively argue that the ascribed ratings were "so plainly unjustified as to lack a rational basis." *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010). Second, even if TRANSCOM's rating discrepancy required more explanation—or if it amounts to a "change in position"—CGSL was not prejudiced by the change in ratings because *all* offerors were assigned fewer strengths than were assigned in the first evaluation: HomeSafe, for example, initially received 22 strengths but only 14 after the Agency's corrective action evaluation. (*Compare* Tab 68 at AR15670 (initial round) *with* Tab 198p at AR32074–76; Tab 198q at AR32220–21; Tab 198r at AR32268–69; Tab 198s at AR32328–30). Although CGSL lost more strengths than other offerors, (*see* Tr. Or. Arg. 11:25–12:1), CGSL has not shown that this evaluation process was applied unfairly or that, but for this error, it would have had a substantial chance of winning the award. *See CliniComp Int'l, Inc. v. United States*, 904 F.3d 1353, 1358 (Fed. Cir. 2018).

If CGSL was the only offeror to lose strengths, or if the 2021 evaluation of its strengths was meaningfully imbalanced, there is a world where CGSL could perhaps show that it was uniquely positioned to win the award but for that error. However, because each offeror lost

similar numbers of strengths, this solidifies the conclusion that the SSEB applied its revised approach for the most recent evaluations equally. This approach, better or worse, affected each offeror. This lack of showing in conjunction with the fact that there are no meritorious criticisms of CGSL's 2021 evaluation, illustrates that the Agency did not commit error.

> ii.  TRANSCOM's discussions with offerors were not misleading or unequal.

"Uneven treatment goes against the standard of equality and fair-play that is a necessary underpinning of the federal government's procurement process and amounts to an abuse of the agency's discretion." *Serco Inc. v. United States*, 81 Fed. Cl. 463, 482 (2008). "All contractors and prospective contractors shall be treated fairly and impartially." FAR 1.102-2(c)(3). "At a minimum, the contracting officer must . . . indicate to, or discuss with, each offeror still being considered for award," "deficiencies" and "significant weaknesses." FAR 15.306(d)(3). Both plaintiffs argue that TRANSCOM's discussions were misleading and unequal, thereby violating the FAR. (CGSL MJAR at 17; ARC MJAR at 29–30). The Record, however, does not support this characterization.

CGSL claims the Agency left the impression it had resolved significant weaknesses in its proposal, resulting in no further changes to CGSL's proposal, but that the Agency held these "weaknesses" against CGSL anyway. (CGSL MJAR at 17). Those perceived "weaknesses" were: (1) CGSL's proposal to automatically assign moves to subcontractors based on their performance scores and availability for work risked "turnbacks" (subcontractors rebooking moves); and (2) CGSL's unbundling of move services among subcontractors, an approach that the Agency believed risked producing unnecessary layers of subcontracting. (*Id.*). Similarly, ARC purports that TRANSCOM failed to inform it of two concerns identified during its evaluation that had a significant, adverse competitive impact on the evaluation and award decision—that ARC's approach to awarding shipments to subcontractors (1) "has a higher potential for creating turnbacks" and (2) "is contingent upon the subcontractors [sic] reliable and consistent use of its ███████." (ARC MJAR at 29–30 (citing Tab 200 at AR34395)). ARC further argues that discussions about the thoroughness of its proposal were unequal in comparison to TRANSCOM's discussions with other offerors. (*Id.*).

An agency's evaluation is unequal where it holds one offeror to "different, and more exacting, technical standards" than another. *CliniComp Int'l, Inc. v. United States*, 117 Fed. Cl. 722, 741 (2014). Contracting officers must indicate deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond. FAR 15.306(d)(3). "As such, when discussions occur, the contracting officer must accurately identify weaknesses. An error in communicating a weakness that causes an offeror to revise its proposal is quintessentially a misleading discussion." *Caddell Constr. Co. v. United States*, 125 Fed. Cl. 30, 45 (2016), *overruled on other grounds*, *Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 998 (Fed. Cir. 2021). Agencies may not mislead an offeror into believing that a flaw has been resolved if the flaw continues to exist. *See Q Integrated Cos., LLC v. United States*, 126 Fed. Cl. 124, 146 (2016) (noting agency "affirmatively misstated that there were no weaknesses"). Misleading discussions constitute "arbitrary and capricious conduct." *Caddell Constr. Co.*, 125 Fed. Cl. 30, at 34.

It is uncontroverted that TRANSCOM conducted extensive discussions in its second round of corrective action, commensurate with the size of the procurement. (CGSL MJAR at 18 (citing *e.g.*, Tab 154a2 (raising 102 issues with CGSL in single round of discussions); Tab 144a at AR21236, AR21265–66 (plan to communicate weaknesses and discussion items); Tab 144b at AR21287, AR21289 (same)); *see also* Tr. Or. Arg. at 22:18–25 (CGSL Counsel, in relevant part: "[]I've never seen discussions as extensive as what happened in the second round; hundreds of deficiencies, weaknesses, across all offerors.")). In 2021, TRANSCOM conducted discussions by issuing evaluation notices. (Tab 198 at AR31392; Tab 267 at AR38315). TRANSCOM issued two types of technical capability evaluation notices: (1) "Technical Capability Deficiencies," which identified proposal deficiencies (*e.g.*, Tab 269.72); and (2) "Technical Capability Other than Deficiency," which identified strengths, weaknesses, significant weaknesses, and discussion items (*e.g.*, Tab 269.91). When an offeror sufficiently addressed the request or concern, TRANSCOM treated the issue as resolved. (Tab 269.215 at AR56618–56716; Tab 269.220 at AR56943–57063).

The RFP states that "[s]ubjective tradeoff procedures will be utilized in accordance with FAR 15.101-1 and DoD Source Selection Procedures [(DoD SSP)]." (Tab 136 at AR21147.2). It is not inconsistent or unreasonable for the SSEB to evaluate proposals against the solicitation and find an approach to be technically acceptable and yet disadvantageous in the final evaluation. (*See* Tab 263 at AR38072). That the SSEB determined that CGSL's approach no longer met the solicitation's definition of a significant weakness does not necessarily render CGSL's approach equivalent to, or more advantageous than, HomeSafe's approach. (Tab 267 at AR38317; Tab 263 at AR38072; Tab 200 at AR34558–34564; Tab 201 at AR34662–34664). TRANSCOM targeted the elimination of all weaknesses, not just deficiencies and significant weaknesses, thus exceeding FAR requirements. *See* FAR 15.306(d)(3). The Record does not show that the SSEB identified CGSL's or ARC's approaches as weaknesses, significant or otherwise, nor that they were treated as such in reaching the technical capability ratings. (*See* Tab 269.216; Tab 263 at AR38070–38071). For example, the SSEB flagged CGSL's payment structure to subtractors as a discussion item that was resolved after clarification. (*Id.* at AR38070–38071). It was not assessed as a weakness, despite how CGSL portrays it. (*See* Tr. Or. Arg. 23:15–16 (CGSL Counsel: "[T]hey didn't call it a weakness, but they treated it as one.")).

As to ARC's claims of unequal treatment, there is also no evidence that TRANSCOM treated its concerns as weaknesses in the final evaluation. With respect to the first alleged concern, the higher potential for turnbacks compared to HomeSafe's approach, the technical evaluation demonstrates that ARC's rating under SF2 was not negatively impacted because of its award management system. (AR Tab 198d). Second, ARC misconstrues the SSEB's assessment that the "effectiveness of [its award management system] approach is contingent upon the willingness of subcontractors to frequently update their respective ███████." (Tab 198d at AR31506). ARC fails to acknowledge the SSEB's assessment that found "required daily updates to the capacity ███████ [were] a *suitable* approach that would likely prevent capacity and scheduling issues DoD experiences under the current [Household Goods] program with respect to agents providing accurate and timely updates to capacity, especially during the high and volatile requirements of peak season." (*Id.*(emphasis added)). This assessment does not indicate that the SSEB considered ARC's award management system, or specifically its use of the capacity ███████, to necessarily constitute a deficiency or a significant weakness. (Tab 7 at AR136).

TRANSCOM was not required to reopen discussions once it determined that HomeSafe's approach was more advantageous. *Lyon Shipyard, Inc. v. United States*, 113 Fed. Cl. 347, 357 (2013). The FAR does not require agencies to inform an offeror that its acceptable approach is less advantageous than an approach proposed by another offeror. FAR 15.306(d)(3); s*ee also DMS All-Star Joint Ventures v. United States*, 90 Fed. Cl. 653, 669 (2010) (explaining that in discussions "'agencies need not . . . identify relative weaknesses in a proposal that is technically acceptable but presents a less desirable approach than others.'") (quoting *WorldTravelService v. United States*, 49 Fed. Cl. 431, 439 (2001)). Plaintiffs fail to acknowledge that advising other offerors of the preferred aspects of HomeSafe's award management system would run afoul of FAR 15.306(e)(1). FAR part 15 prohibits the agency from revealing another "offeror's technical solution." FAR 15.306(e)(2). Thus, if HomeSafe provides a different method in its technical proposal that TRANSCOM found more advantageous, it would contravene FAR requirements to share that with other offerors to urge them to implement the same methodology. Any argument otherwise is circular and leads to spoon-feeding offerors—something well beyond FAR requirements. *See Standard Comms., Inc. v. United States*, 101 Fed. Cl. 723, 740 (2011) (meaningfulness requirement "does not mean that an agency must spoon-feed an offeror as to each and every item that must be revised, added or otherwise addressed to improve a proposal.") (internal citations omitted). So long as the agency "leads" the offeror to the general area of concern, the agency fulfills its obligations. *D&S Consultants, Inc. v. United States*, 101 Fed. Cl. 23, 40–41 (2011).

Any dismissive discussion of those approaches was done in a comparative manner, designed to explain the additional benefits HomeSafe's differing approach offered the Agency. Once the weaknesses of each offer were addressed, the SSEB's determinations warranted no additional discussion. This is a rational decision clearly reflected in the Administrative Record; it was neither arbitrary nor capricious. Further, the Court cannot find that either party was prejudiced by factors that SSA does not explicitly treat as a weakness.

### iii. TRANSCOM's evaluation of the parties' proposals was rational.

CGSL argues that TRANSCOM irrationally evaluated HomeSafe's proposal, essentially giving credit where none was due, specifically regarding SF2. (CGSL MJAR at 29). First, it claims that TRANSCOM ignored HomeSafe's approach of awarding moves to subcontractors—one of the central features upon which TRANSCOM distinguished between HomeSafe's and CGSL's proposals—was internally inconsistent and contradicted HomeSafe's statements during discussions. (*Id.*). The United States and HomeSafe maintain that HomeSafe's proposal did not contain inconsistencies, and even if it did that the written proposal surmounts its oral statements.

Agencies may exercise a great deal of discretion in procurement, but the agency has even greater discretion in a best value procurement than if the contract were awarded based on cost alone. *Galen Med. Assoc., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004). Thus, assigning the relative merit of competing proposals is primarily a matter of administrative discretion. *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996) (quotation omitted). In *Office Design Grp. v. United States*, the Federal Circuit held that to prevail on a disparate treatment claim, "a protestor must show that the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals." 951 F.3d 1366, 1372–73 (Fed. Cir. 2020) ("A protestor may

also prevail by showing that the agency inconsistently applied objective solicitation requirements between it and other offerors, such as proposal page limits, formatting requirements, or submission deadlines."). CGSL has not shown that the agency unreasonably downgraded its proposal. Thus, the Court finds that CGSL's gripe as to discrepancies in HomeSafe's proposal amounts to subjective disagreement with the manner in which the Agency ascribed value.

HomeSafe alleges that CGSL misunderstands the subcontractor approach explained in its proposal. (HomeSafe MJAR at 33). In discussions, the Agency clarified "with respect to HomeSafe's use of the word '███' versus '███,' . . . for consistency purposes, the process remain[ed] the exact same regardless of what verb is used." (*Id.* (citing AR38129–30; *compare* Tab 147b at AR22241 with Tab 178b at AR28123 (showing HomeSafe proposed the same process for subcontractor assignments in the initial and final proposal))). The SSAC touted that HomeSafe's approach was "more advantageous" because HomeSafe had "an absolute understanding of its efficient selection process" and "phenomenally lays out its selection procedures and even intertwines it with its approach to ███ in order to optimize the network." (*Id.* (citing AR34572–73)).

So long as an agency documents its final award decision and includes the rationale for any business judgments and tradeoffs, the Court will not disturb the agency's decision. *Blackwater Lodge & Training Ctr., Inc. v. United States* 86 Fed. Cl. 488, 514 (2009). Even if HomeSafe's proposed subcontractor approach amounted to an inconsistency between the oral presentation and the written proposal, the SSEB Report indicates that HomeSafe's written proposal "takes precedence" over its oral presentations. (Tab 269.221 at AR57100–01, AR57103–04). Neither the SSAC's nor the SSA's reports reference HomeSafe's oral presentation. (Tab 200 at AR34570–74; Tab 201 at AR34659–64). The SSAC identified HomeSafe's "███ based" selection process, (Tab 269.159 at AR54890–93), as an innovative and meaningful approach. (USA MJAR at 10 (citing AR34573)). CGSL's failure to receive a similar endorsement is not a basis to disturb the award.

Second, CGSL contends that TRANSCOM inaccurately concluded that HomeSafe proposed to exceed the RFP's 40% small business participation commitment by more than CGSL. (CGSL MJAR at 31 (citing Tab 136 at AR21143 (requiring submission of "a completed Small Business Commitment Document (Attachment 9)" that "identif[ies] the Offeror's commitment to the 40% utilization of small business concerns in the performance of this contract in accordance with PWS paragraph 1.2.1.2.2"); Tab 134b1 at AR21078 (describing "forty percent" requirement))). According to CGSL, this percentage is miscalculated and HomeSafe failed to fill out the Small Business Participation Form correctly. (*Id.*).

HomeSafe's proposal committed to subcontracting "50% of total [continental United States] – based contract value" to small businesses. (Tab 269.159 at AR54890). Here, the Agency assigned a strength to any offeror that proposed to exceed the 40% threshold, regardless of the amount that would exceed the threshold. (Tab 200 at 34568). TRANSCOM assigned both CGSL and HomeSafe a strength for exceeding the 40% subcontracting commitment. (*Id.*). The SSAC determined that HomeSafe's commitment of 50% and CGSL's commitment of 46.71% (a difference of 3.29%) were roughly equivalent. (Tab 200 at AR34568). By CGSL's calculations, HomeSafe's relevant commitment should have been 43.41%, not 50%. (CGSL MJAR at 32). Even if that is correct, it is reasonable that the SSAC would come to the same conclusion based

on CGSL's alleged difference of 3.3%. Because both offerors proposed to exceed the 40% threshold, whether it was by 10% as HomeSafe proposed or 3.41% as CGSL believes HomeSafe should have proposed, the SSAC reasonably concluded that there was not a discernible difference between the proposals. CGSL has not shown that even if this constitutes a miscalculation that it was prejudicial.

Although CGSL asserts that HomeSafe failed to fill out the Small Business Participation Commitment document correctly, which CGSL claims required the Agency to reduce HomeSafe's commitment to small businesses, that document represents only proposed and estimated amounts and vendors. (Tab 264 at AR38132). Further, it was not incorporated into the contract upon award. (*Id.*). Thus, the Agency had no way of ensuring either that the proposed subcontractors receive work under the contract or that the proposed subcontractors receive those estimated amounts. (*Id.*) If it were the case that the awardee failed to live up to this expectation, it amounts to issues of contract administration. Thus, HomeSafe's oversight could not have prejudiced CGSL.

ARC shares the opinion that TRANSCOM unreasonably evaluated offerors' proposals under the technical factors. (ARC MJAR at 21–29). This is based on the Agency's evaluation of SF1, SF2, and SF4. First, ARC maintains that HomeSafe failed to comply with the material terms of the PWS. PWS § 1.2.6.3.1 requires the contractor to "provide packing materials that are new or in sound condition, except in the case when the customer has provided original or specially designed packaging that the contractor has inspected and accepted as being as good or in sound condition." (*Id.* at 22 (citing Tab 134b1 at AR21083)). ARC suggests that the contractor must complete two steps to fulfill this requirement: (1) accommodate customers' requests to use their own "original or specially designed packaging" and (2) "inspect[] and accept[]" the customer-provided packaging "as being as good or in sound condition." (*Id.* citing PWS). Further, PWS § 1.2.6.15 requires the contractor to "provide unpacking and reassembly services unless waived by the customer." (ARC MJAR at 22 (citing Tab 134b1 at AR21087)). ARC states that HomeSafe's proposal did not commit to performing either of these steps, (AR28101), and should have been found unacceptable.

ARC has pointed to no authority mandating that a proposal must, in painstaking detail, discuss every single PWS requirement to be found acceptable. In support of its argument, ARC cites *Mortgage Contracting Services v. United States*, 153 Fed. Cl. 89, 142 (2021), but that case is inapplicable. *Mortgage Contracting Services* applies only where the deviation from a solicitation term is "material," when that deviation has "more than a negligible impact on the price, quantity, quality, or delivery" of the services. *Id.* And the United States correctly notes that ARC ignores HomeSafe's proposal which logically encompasses the requirement to use original or specially designed packaging that the contractor has inspected and accepted as being as good or in sound condition. HomeSafe's proposal states that it will "comply with all DoD packing material requirements." (USA MJAR at 22–23, 44–45).

Further, ARC misstates the scope of PWS § 1.2.6.3.1. A plain reading of the requirement demonstrates that, while the contractor is required to inspect customer-provided packaging, it is not required to accommodate those requests. Instead, the contractor must find the packaging to be in good or sound condition. (Tab 134b1 at AR21083). The SSEB did not determine that HomeSafe needed to acknowledge an exception to the requirement to meet it, nor did it find the

wording of HomeSafe's proposal to prohibit the waiver of unpacking and reassembly by the customer. (*Id.* (citing Tab 198p at AR32069)). This is not an irrational decision.

Second, ARC states that TRANSCOM deviated from the RFP standard when evaluating SF3, specifically because ARC proposed to accelerate ▮ evaluated transition requirements that contained deadlines. (ARC MJAR at 24 (citing Tab 198e at AR31553–60)). In conducting its evaluation, the SSEB determined that it "did not assess early completion of transition requirements as being advantageous to the Government[,]" and that the "tasks and respective timelines associated with transition . . . coincide with the Government's estimated timelines for the Government to be prepared to handle said transition related tasks." (Tab 198e at AR31554–31560). Similarly, the SSAC determined that "early completion of tasks during the transition period was . . . not . . . advantageous to the Government as the transition period will remain at nine (9) months and therefore accelerated integration was not evaluated to have a positive (or negative) impact on either transition or ultimately contract performance." (Tab 200 at AR34396). To prevail in a protest alleging an agency departed from the stated evaluation criteria, "a protestor must show that (i) the procuring agency used a *significantly* different basis in evaluating proposals than stated; and (ii) the protester was prejudiced as a result – that it had a substantial chance to receive the contract award but for that error." *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 386–87 (2003) (emphasis added). Simply because TRANSCOM did not find accelerated transition timelines to be advantageous does not equate to an evaluation in which no consideration was given to the offerors requisite approach and understanding of said requirements. And it certainly cannot be said that it is evidence of a significant deviation.

Lastly, ARC maintains that TRANSCOM's evaluation of SF 4 was arbitrary and capricious because it forced ARC to proceed through several steps to thoroughly explain its Multifactor Authentication ("MFA") when other offerors did not face the same requirement. (ARC MJAR at 26). Per ARC's argument, no offeror explained what solution they would use to provide MFA for government users. (*Id.*). However, the United States argues that ARC's contention is undermined by the Administrative Record, which demonstrates that TRANSCOM equally evaluated the parties' proposals on each front. (USA MJAR at 49). Relevant here, HomeSafe's proposal states, "[a]s ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in all HomeSafe applications it is impossible to circumvent or bypass the [MFA] component of this solution." (Tab 178b at AR28161). Thus, ▮▮▮▮▮▮▮▮▮▮▮ in all HomeSafe applications enforces MFA for all users which logically includes all government users. Because ARC's complaint is simply a disagreement with the Agency's subjective technical evaluation judgments, again, it is no basis to disturb the award.

Federal procurement entities have broad discretion in making contract award decisions. *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1354 (Fed. Cir. 2004). "When technical evaluation errors are alleged, those technical ratings fall within a category of 'discretionary determinations of procurement officials that a court will not second guess.'" *iAccess Techs., Inc. v. United States*, 143 Fed. Cl. 521, 527 (2019) (quoting *E.W. Bliss Co.*, 77 F.3d at 449). The Court's task is to determine whether an agency's evaluation and award decision have a rational basis and do not violate statutory or regulatory requirements, prohibitions, or standards. *Savantage Fin. Servs.*, 595 F.3d at 1285–86. Should Plaintiffs believe that the SSA failed to explain its rationale in evaluating these portions of the PWS, the Court must still uphold that decision when an agency's path may reasonably be discerned. *See Bowman Transp., Inc.*, 419

U.S. at 285–86. The Court finds that the Record reflects a reasonable discernable, rational evaluation of the offerors' proposals and adequate support of the award to HomeSafe.

### iv. TRANSCOM followed the RFP's evaluation scheme, and its best value tradeoff was rational.

Plaintiffs contend that the best value tradeoff was conducted arbitrarily, capriciously, and irrationally. CGSL attacks both the SSAC's comparative analysis concluding that HomeSafe presented a more advantageous technical approach and the SSA's ultimate finding that HomeSafe's "superior technical solution warrants the minimal 1.26% difference between the Offerors' proposals." (CGSL MJAR at 6–12, 33–34; *see also* Tab 201 at AR34671). Similarly, ARC argues that TRANSCOM's best value tradeoff analysis is flawed because of how it conducted its comparative analysis of the offerors' technical SFs. (ARC MJAR at 33–34). The Court finds that, contrary to Plaintiffs' assertions, the Agency conducted a proper comparative analysis that was, among other things, in accordance with the RFP. Ultimately, Plaintiffs object to the manner in which the Agency performed its tradeoff analysis. However, their subjective disagreement with the analysis does not establish that the Agency's decision lacked a rational basis, as required. *See KSC Boss*, 142 Fed. Cl. at 380–81.

#### 1. TRANSCOM correctly followed the RFP's evaluation scheme.

CGSL surmises that TRANSCOM's decision to award the subject contract to HomeSafe was arbitrary and capricious because its evaluation contravened the scheme delineated by the RFP. (CGSL MJAR at 6–12). Specifically, it alleges that TRANSCOM downplayed CGSL's "superiority" for technical SFs 1 and 3. (*Id.* at 7, 9–10). According to CGSL, it was unlawful and contrary to the RFP for the SSA "to single out preferred factors, such as ease of use and customer experience as being 'extremely impactful,' as determinative in the tradeoff while diminishing the importance of such factors as transition and phase-in volume." (*Id.* at 12). While this argument is understandable, it is not compelling.

An agency is given broad discretion to conduct a reasonable determination that is consistent with the solicitation. That said, agencies must evaluate proposals and make source selection decisions following the terms of the solicitation. *See* 10 U.S.C. § 3301(a); FAR 15.304(a); FAR 15.305(a). This includes adhering to the weighting assigned to each evaluation factor. *See BayFirst Solutions, LLC v. United States*, 102 Fed. Cl. 677, 694 (2012) ("This is not the weighting scheme set forth in the solicitation, and therefore constitutes an arbitrary and improper evaluation scheme."); *360Training.com, Inc. v. United States*, 106 Fed. Cl. 177, 190 (2012). It is unlawful for an agency to solicit proposals on one basis but evaluate them on another. *See FirstLine Transp. Sec., Inc. v. United States*, 100 Fed. Cl. 359, 382 (2011) ("Having announced the relative weight of the non-price factors in the RFP, the government was not free to evaluate the proposals and award the MCI contract in accordance with another scheme, regardless of the reasonableness of that scheme.").

Even so, it is well established that adjectival ratings are merely a guide. *Hyperion Inc. v. United States*, 92 Fed. Cl. 114, 119 (2010). As with matters of contract interpretation, the Court must give the text of the solicitation its plain and ordinary meaning. *Id.* It "must interpret [the solicitation] as a whole" and in a manner that gives reasonable effect "to all its parts and avoids

conflict or surplusage of its provisions." *Gardiner, Kamya & Assocs., P.C. v. Jackson*, 467 F.3d 1348, 1353 (Fed. Cir. 2006) (internal quotation marks and citation omitted).

In this case, the SSA was required to weigh all subfactors equally giving each no more, and no less, than 25% of the overall Technical Capability assessment. (Tab 7 at AR135). This requirement is undisputed. It is also true that each subfactor encompassed varying numbers of requirements, but the RFP was silent as to their relative weight. CGSL maintains that the discrepancy of requirements caused the SSA to disregard the equal weighting of subfactors to justify the determination that HomeSafe's Factor 2 proposal had greater merit, thereby warranting a 1.26% ($225 million) price premium. (CGSL MJAR at 7). To illustrate its point, CGSL points out that the SSA acknowledged that CGSL's proposal was superior to HomeSafe's proposal in SFs 1 and 3, notwithstanding their equivalent Acceptable ratings, but then "downplayed" CGSL's advantages as having less value than other features in HomeSafe's proposal. (CGSL MJAR at 8; Tab 201 at AR34659, AR34666).

CGSL states that the SSA inflated the importance of HomeSafe's approach to individual PWS requirements. (CGSL MJAR at 8). For example, the SSA found that HomeSafe's approach to the ease of use PWS requirement under SF4 was "extremely impactful to improving the customer experience, as the IT system will be utilized by the customer for virtually all aspects of each of the roughly 400,000 annual moves that will be serviced under GHC." (AR34667). Further, the SSAC determined that the "impact" of HomeSafe's strength under SF4 for allowing customers to ███████████████████ arrival was "slightly larger than the combined impact of CGSL's [SF] 1 approaches to Claims Settlement/Adjudication as well as Customer Payout Options and Minimizing Transfer of Claims . . . and Inconvenience Claims combined" because "the impact of HomeSafe's [SF] 4 ██████████████ approach can be felt by the customer, during both pick-up and delivery, on every move whereas the impact of CGSL's [SF] 1 approaches . . . will only be felt by customers on moves in which claims must be filed." (AR34647). With respect to claims settlement and inconvenience claims, the SSA found CGSL's advantages less impactful because "the difference only extends to one part of the move process, specifically claims, which will not occur in every move, or likely even the majority of moves." (AR34658).

As to CGSL's argument that some of its strengths were downplayed, HomeSafe points out that CGSL omits introduction and conclusion sentences to that excerpted paragraph, acknowledging "that there are areas in which CGSL's proposal provided benefits that HomeSafe's proposal did not also provide." (HomeSafe MJAR at 29, citing AR34671); *see also* Tr. Or. Arg. 18:16–18 ("The decision cannot be rational if [the SSA] does not even acknowledge attributes of CGSL's proposal that were better.")). To the contrary, the SSA specifically discussed CGSL's advantages and the ways CGSL's proposal was more impactful to customer experience, as well as its advantages in point of contact, delivery, and claim settlement and adjudication. (Tab 201 at AR34657–59). Contextually, TRANSCOM did not "downplay" or ignore CGSL's advantages, but merely summarized its conclusions and provided select examples given the voluminous Record. Contrary to CGSL's argument, highlighting different requirements in the various subfactors is not evidence of unequal weighting.

Further, the RFP allows the CO to consider customer experience, such as ease of use, in the tradeoff analysis. (Tab 136 at AR21142; *see also* Tr. Or. Arg. at 46:24–47:2). The SSA addressed some requirements, like ease of use, not because the SSA prioritized them but because

they were areas in which there was a discernible difference between HomeSafe's and CGSL's proposals for that SF. (*See* AR34667–71). The United States effectively argues the SSA was merely discussing the differences in competing proposals and documenting the supporting rationale for business judgments and tradeoffs rather than pointing out these differences because weight was unevenly distributed. (USA MJAR at 29–30). The RFP requires TRANSCOM to equally weigh the four subfactors, but it permits a finding that the "impact" of HomeSafe's SF4 strengths is greater than CGSL's strengths under other SFs. (AR34667–68). The Court of Federal Claims has upheld an agency's determination that the awardee's superiority in one equally weighted subfactor outweighed a disappointed bidder's superiority in another subfactor in a best value procurement. *See Plasan N. Am., Inc. v. United States*, 109 Fed. Cl. 561, 577 (2013) (finding that award turning on one subfactor did not indicate greater weight, but that awardee outperformed disappointed bidder by greater magnitude than the disappointed bidder outperformed in other subfactors). Just because all SFs are of equal importance for evaluation purposes does not mean that, in conducting best value determination, an offeror's approach to one SF cannot be more valuable than another offeror's approach to a different SF. In plainer terms, equally important requirements do not translate to equally valuable approaches.

TRANSCOM's conclusion regarding the relative impact of the offerors' strengths did not create a new weighting scheme centered on the percentage of moves impacted by a particular proposal feature but instead constituted an observation about the degree of benefits to the United States. Statements and comparisons in this regard are inherent in a best value tradeoff. *See Am. Relocation Connections, LLC v. United States*, 147 Fed. Cl. 608, 617–19 (2020) (acknowledging agency "discretion—and duty—to analyze one offeror's superiority over another, especially their technical capabilities to perform the contract"). The Court finds that the SSA's relative weighting as it appears in the Record is perfectly reasonable and consistent with the solicitation. It does not evidence an improper predilection for HomeSafe as ARC and CGSL contend.

### 2.  Best Value Tradeoff Analysis

CGSL and ARC assert that TRANSCOM's best value tradeoff analysis was irrational. Again, these arguments amount to subjective disagreement with the Agency's analysis. Mere disagreement from a protestor does not establish that an agency's decision lacked a rational basis. *KSC Boss*, 142 Fed. Cl. at 380–81.

"Procurement officials have substantial discretion to determine which proposal represents the best value for the government." *E.W. Bliss*, 77 F.3d at 449. Adjectival ratings "are not subject to a mathematical calculation." *Glenn Def. Marine,* 720 F.3d at 909 n.6. Additionally, "[t]he process of making a 'best value' decision is not merely an exercise in adding up strengths and weaknesses, but a comprehensive comparative analysis that necessarily is influenced by the procurement official's expertise." *Coastal Int'l Sec., Inc. v. United States*, 93 Fed. Cl. 502, 550–51 (2010) (citing *Galen Med. Assocs.*, 369 F.3d at 1330).

The FAR requires an agency's final award decision to "be based on a comparative assessment of proposals against all source selection criteria in the solicitation." FAR 15.308. "To determine whether and to what extent meaningful differences exist between proposals, agencies should consider both adjectival ratings and information on advantages and disadvantages of the proposals." *Femme Comp Inc. v. United States*, 83 Fed. Cl. 704, 758 (2008) (internal quotations

omitted). "Looking beyond the adjectival ratings is necessary because proposals with the same adjectival rating are not necessarily of equal quality." *Id.* (internal quotations and citations omitted).

CGSL argues that even if the Court determines that the evaluation ratings and assignment of strengths were reasonable, the tradeoff was arbitrary and contrary to law because the SSA failed to (1) exercise reasonable "independent judgment," (2) accurately assess the relative merit of CGSL's and HomeSafe's proposals, and (3) give due weight to CGSL's $225 million cost savings. (CGSL MJAR at 32–33). Specifically, CGSL takes issue with the SSA's single-paragraph iteration to explain why HomeSafe was the superior offeror. (*Id* at 33 (citing Tab 201 at AR34671)). CGSL maintains that this finding ignores multiple aspects of CGSL's proposal containing more detail than HomeSafe's proposal due to the SSAC's determination that no discernible difference in detail existed. (*Id.*). CGSL insists that the ignored excerpts of its proposal show that CGSL had a greater understanding of multiple requirements, such as CGSL's proposal to accept original packaging from the customer under PWS § 1.2.6.3.1, Packing Materials, (*see* Tab 196a at AR31301); how CGSL would resolve claims for PWS § 1.2.7.2.4, Hardship Expenses, (*see id.* at AR31307); and the specific subject matter of its government personnel training under Appendix A.2.2.5, (*see id.* at AR31351). (CGSL MJAR at 33).

ARC opines that TRANSCOM's best value tradeoff was unreasonable because it did not perform any analysis of whether ARC's SF 1 approach was more beneficial than HomeSafe's SF 2 approach. (ARC MJAR at 34). ARC asserts that the SSA instead concluded that because each offeror was superior under one of these subfactor tradeoffs, the approaches overall were "roughly equivalent." (ARC MJAR at 34 (citing AR34472). Had it compared those subfactors, ARC believes that the SSA would have concluded that its SF 1 approach, which would "significantly affect both customers and the customer's property," was more beneficial than HomeSafe's SF 2 approach, which merely "contributes to an overall improved move experience." (*Id.* (citing AR34470, AR34472)).

That there were no "discernible differences" between various strengths among proposals is not an indication they were not considered when TRANSCOM made its final award. It merely shows that strengths existed for both offerors that did not warrant further distinction. This does nothing more than illustrate that the SSA acknowledged the benefits of both offerors; to consider it further is an invitation for the Court to replace its judgment for the agency's, an improper intrusion into the discretion afforded the agency. *See KSC Boss*, 142 Fed. Cl. at 380–81. The Record shows that HomeSafe had higher adjectival ratings under SFs 2 and 4, but TRANSCOM did not rely on adjectival ratings or a rote counting of strengths and weaknesses; the United States notes that "there are nearly 200 pages of documentation demonstrating that TRANSCOM appropriately went behind the adjectival ratings in conducting a qualitative analysis between CGSL and HomeSafe that . . . supports its best value determination." (USA MJAR at 26 (citing Tab 258a at AR37780)). This is affirmative evidence that the SSA considered the offerors' proposals fully and comprehensively.

As to ARC's additional arguments, the Agency rated both HomeSafe and ARC "Acceptable" under SF 3 but concluded that ARC was more advantageous in "one (1) out of eleven (11) requirements." (Tab 200 at AR34423). That is, ARC already received an advantage

under SF 3 and cannot reasonably show that a single additional strength would have merited a higher rating (much less a $1.6 billion premium).

Finally, CGSL cites the SSA's statement that servicemembers are "absolutely deserving of the quality of service and support HomeSafe will provide" and that HomeSafe's proposal therefore "handedly warrants" a $225 million price premium. (CGSL MJAR at 33 (citing AR34673)). CGSL believes that this supports the contention that "the SSA readily admitted that he viewed non-price factors as more important than price." (*Id.* (emphasis removed)). Not so, but it is nevertheless obviated by the explicit language of the RFP. The RFP stated that each "Offeror's Technical Capability will be evaluated on a basis *approximately* equal to price." (Tab 136 at AR21148 (emphasis added)). This has no bearing on the best value tradeoff analysis because there is no requirement that non-price factors be weighted exactly equal to price as CGSL contends. (Tr. Or. Arg. at 17:12–18 (CGSL Counsel: "It's saying that because the contracted services are critical, therefore . . . this is more important. And that's an example of . . . treating technical as more important than price.")). Thus, the RFP clearly contemplates different weights given to non-price factors.

TRANSCOM was clearly within its discretion to evaluate this procurement under a best value tradeoff analysis instead of a price-based analysis. And there is no designated method for conducting a best value determination; it is an analysis specific to agencies that may vary from one solicitation to another. In a best value tradeoff analysis, the agency provides guidance as to the relative weight of price and technical factors, but it is not bound to blindly adhere to a crude metric as suggested by Plaintiffs. This is not simply a "cost versus technical" analysis. (*See* Tr. Or. Arg. 42:9–10). The Court has held that in a best-value procurement, agencies may decide to select a lower-technically-rated proposal, even if the solicitation emphasizes the importance of technical merit, if it decides that the higher price of a higher-technically-rated proposal is not justified. *Mil-Mar Century Corp. v. United States*, 111 Fed. Cl. 508, 552–553 (2013) (citing 48 C.F.R. § 15.101-1(a)). Under that rationale, the inverse must also be true—that under a best value tradeoff analysis it is reasonable for an agency to decide that the higher price of a higher-technically-rated proposal is justified. CGSL's argument is a misplaced attempt to convert this procurement into a lowest-price procurement. As iterated in the preceding section, a procurement official is granted more discretion in a best value tradeoff analysis because the two are inherently different based on the procurement. *See Galen Med. Assoc.*, 369 F.3d at 1330.

> v.   HomeSafe's representation regarding FedRAMP compliance was not material
> to the solicitation and therefore cannot prejudice ARC.

ARC next claims that TRANSCOM should have disqualified HomeSafe because its proposal included a material misrepresentation.[5] ARC's argument is comprised of three components: (1) HomeSafe's representation that "███ has achieved FedRAMP High compliance" was false because ███ had obtained authorization only at the lower, Moderate, level; (2) HomeSafe's misrepresentation was material because TRANSCOM relied on it to award HomeSafe a strength that contributed to its award decision; and (3) ARC was prejudiced

---

[5] This argument has been the subject of various other Court orders, (ECF Nos. 42, 67), regarding discovery. Facts and findings in those orders are adopted in this Opinion.

because, in any reevaluation, HomeSafe would be disqualified based on its misrepresentation. (ARC MJAR 8–16).

Bid protests are typically judged in a finite universe, one limited by the administrative record. When proposals use falsified information or offerors wish to use evidence outside of the administrative record, the sky opens allowing the Court to consider extraneous evidence. To establish a material misrepresentation, a protester must demonstrate that "(1) [the awardee] made a false statement; and (2) the [agency] relied upon that false statement in selecting [the awardee's] proposal for the contract award." *Blue & Gold Fleet, LP v. United States*, 70 Fed. Cl. 487, 495 (2006) (citation omitted), *aff'd*, 492 F.3d 1308 (Fed. Cir. 2007); *see also Sealift, Inc. v. United States*, 82 Fed. Cl. 527, 538 (2008). It would be naïve to believe "that the evidence necessary to support a claim of a knowing misrepresentation in a proposal would ever be located in an agency's administrative record filed with the Court." *Golden IT, LLC v. United States*, 157 Fed. Cl. 680, 702 (2022) (citations omitted). For the Court to evaluate ARC's material misrepresentation allegations, it logically follows that the Court must consider extrinsic information supporting those allegations. *Connected Glob. Sols., LLC v. United States*, 160 Fed. Cl. 420, 424 (2022). The Court has considered the extrinsic information put forth by ARC and finds that ARC has not carried its burden. Though the Court is concerned with the veracity of HomeSafe's statement, ARC was not prejudiced because the relevant factor was not material to the procurement.

"FedRAMP" refers to the Federal Risk and Authorization Management Program, which provides a standardized approach to security assessment, authorization, and continuous monitoring for cloud products and services as a prerequisite for use by the Federal Government. (Tab 231 at AR37116; Tab268.427 at AR50453). FedRAMP provides "a uniform way to determine . . . security capabilities." *Oracle Am. v. United States*, 144 Fed. Cl. 88, 118 (2019). The security categories are based on the potential impact that certain events would have on an organization's ability to accomplish its assigned mission, protect its assets, fulfill its legal responsibilities, maintain its day-to-day functions, and protect individuals. (ECF No. 42 at 2 (citation omitted)). Security ratings are categorized into one of three impact levels—Low, Moderate, and High–across three security objectives—Confidentiality, Integrity, and Availability. (Tab 268.427 at AR50453.).

Under the IT Services SF of the GHC RFP, TRANSCOM asked offerors to describe their technical approaches to meeting 16 separate requirements, one of which was "Secure Access." (Tab 7 at AR201; Tab 201 at AR34667). For this requirement, contractors had to "provide and maintain an easy to use, secure, web-based, mobile device compatible IT system able to manage complete household goods relocation services globally during peak (surge) and non-peak seasons." (*Id.*). To meet the secure access requirement, HomeSafe proposed the use of "███" products and services. (Tab 178b at AR28160). HomeSafe's proposal indicated that "██████ has achieved FedRAMP High compliance, HomeSafe is able to take advantage of ████ Authority to Operate (ATO) to ensure its own FedRAMP compliance,"— the problematic statement at issue. (*Id.*).

The FedRAMP program management office, under the auspices of the GAO, maintains a public website that lists all FedRAMP authorizations, including the impact level of each authorization. *FedRAMP Marketplace*, FedRAMP, https://marketplace.fedramp.gov (last visited

Oct. 16, 2022). ARC points to this publicly available information showing that ▮▮▮ has achieved authorization only at the Moderate impact level. (ARC MJAR at 9). ARC thus argues that the representation that ▮▮▮ had achieved a High compliance score is a material misrepresentation and takes issue with HomeSafe receiving a strength because of that compliance score. (*Id.*). ARC cites the SSEB's praise of HomeSafe's IT plan, which stated:

> As stated, ▮▮▮ has achieved FedRAMP High compliance which involves the highest level of security controls. As such, a highly secure ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ solution provides the most stringent security controls resulting in a heightened level of security for ▮▮▮▮▮▮ ▮▮▮▮▮. As such, this aspect of the proposal was considered to be advantageous to the Government.

(Tab 178b at AR28160).

ARC previously noted this perceived misrepresentation in its protest before the GAO; the GAO subsequently invited the parties to provide additional briefing on the appropriate remedy when an offeror's proposal contains a material misrepresentation. (Tab 239a.). In response, HomeSafe submitted an apparently self-serving declaration from the President of one of its subcontractors as evidence that HomeSafe did not intend to "mislead the Agency regarding ▮▮▮ FedRAMP status," and indicated that HomeSafe relied on publicly available information from ▮▮▮ website. (*Id.* at AR37422–23, ¶ 10). The declaration seems to indicate that the program could be configured to meet specific needs in instances where a High rating was necessary. It states that ▮▮▮ website includes documentation advising users on how to configure ▮▮▮ for FedRAMP compliance. (*Id.*).

The referenced documentation provides, in relevant part, that ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.* at AR50454). Further, the declaration states that ▮▮▮ website informs users that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Tab 239a at AR37422–23). The GAO determined that, based on these representations, HomeSafe had not made material misrepresentations in its proposal. (Tab 251 at AR37535). The Court is not bound by the GAO's determination, nor is it particularly swayed by it, but it accepts its explanation as instructive.

The Court begins its analysis by addressing Defendants' misconceptions regarding the viability of a material misrepresentation claim. As the Court has held and reiterated, HomeSafe's intent is immaterial. *Connected Glob. Sols., LLC v. United States*, 159 Fed. Cl. 801, 808 (2022) ("Assuming this would go to HomeSafe's intent, rather than the fact that HomeSafe made a misrepresentation, that is not at issue."); *Connected Glob. Sols.,* 160 Fed. Cl. at 424 ("the Court notes again that the relevant inquiry here is whether HomeSafe's representation on its face was false, not HomeSafe's intent."). A material misstatement made with the intent to deceive is particularly egregious, but that "does not mean that an agency lacks the discretion to disqualify a proposal that contains a material misrepresentation that an offeror included inadvertently (as opposed to intentionally) in its proposal." *NetCentrics Corp. v. United States*, 145 Fed. Cl. 158,

169 (2019). Simply put, it is nonsensical to explore the subjective factors of "intent" in a case normally confined to an administrative record.

The United States equates this misrepresentation issue to an issue of contract administration. (USA MJAR at 32). The Court rejects this argument. The United States bases this, in part, on a case decided by the undersigned. In *Huffman Bldg. P, LLC v. United States*, the Court found that the awarding agency was entitled to rely on the awardee's representation of technical compliance based on the totality of the circumstances. 152 Fed. Cl. 476, 486–87 (2021). Here, the United States ignores that ARC's allegation could have been proved or disproved by documents *within* TRANSCOM's access. FedRAMP is a publicly available website, completely dissimilar to the outside records at issue in *Huffman.* It is unreasonable to find that the United States is entitled to rely on representations it has the resources to debunk merely by looking to easily accessible records.

HomeSafe also argues that the Federal Circuit does not recognize offeror misrepresentation (absent agency involvement or indicia on the face of a proposal) as an APA bid protest cause of action. (HomeSafe MJAR at 9–11). This is false. Allegations of material misrepresentation can be the basis for a bid protest. *See e.g., LightBox Parent, L.P. v. United States*, ___ Fed. Cl. ___, 2022 WL 4241847, at *6 (Fed. Cl. Aug. 26. 2022) (acknowledging that the Court of Federal Claims has employed this in the context of bid protests); *Plan. Rsch. Corp. v. United States*, 971 F.2d 736, 740–41 (Fed. Cir. 1992) ("[T]he misrepresentations of [the contractor], together with the 'massive' personnel substitutions made by [the contractor] after award with the acquiescence and assistance of [the agency], tainted the bidding and evaluation process."); *Optimization Consulting, Inc. v. United States*, 115 Fed. Cl. 78, 99 (2013) ("[T]he submission of a misstatement, as made in the instant procurement, which materially influences consideration of a proposal should disqualify the proposal.") (internal quotations omitted); *Blue & Gold Fleet*, 70 Fed. Cl. at 495 ("To preserve the integrity of the solicitation process when such a material misrepresentation influences the award of the proposal, the proposal is disqualified from consideration."). Thus, any argument that a material misrepresentation claim is improper before this Court is not well founded.

Turning to the merits of ARC's claim, the FedRAMP website shows that ███ had not achieved High Compliance at the time of award. In an attempt to salve this, the United States points out that, to achieve DoD IL4 PA status, typically a company must hold FedRAMP Moderate status at a minimum, and then implement the heightened DoD-specific controls. (AR50454). ███ DoD IL4 PA status exceeds FedRAMP Moderate security requirements and fundamentally met the FedRAMP High requirements, which are less stringent than DoD-specific security requirements. (*Id.*). It is outside of this Court's purview to equate the standards of DoD-specific controls and FedRAMP compliance.

Based on the documents supplied at the GAO's request, (Tab 239a AR37422–23), Defendants have shown ███ allows users to configure the settings to meet High compliance. The statement at issue, that HomeSafe may take advantage of ███ High compliance score, is not entirely false. Even so, it is suspect. Offerors should take care to utilize transparent language in their bids. Likewise, agencies are not relieved from reviewing records *in their own control* (or subject to an internet search) to debunk terms of a proposal.

Despite the truthfulness of the statement, ARC must show the Agency's material reliance in making its final award. ARC cannot. Misstatements must *materially* influence the consideration of a proposal. *See Optimization Consulting, Inc.*, 115 Fed. Cl. at 99. TRANSCOM found that HomeSafe was more advantageous under SF 4 based on an evaluation of 16 requirements, one of which was secure access. (Tab 201 at AR34667; *see also* Tr. Or. Arg. 69:20–23 (DOJ Counsel: "TRANSCOM found HomeSafe more advantageous based on -- it was the 16 requirements were evaluated; it was more advantageous in nine out of 16 requirements.")). Thus, this was a mere, single requirement among several under IT Services. There is no evidence that the SSA materially relied on this particular requirement; it is not explicitly stated in the SSDD.

The only other apparent way to justify that this representation was a material part of the award decision is to show that it was relevant to a material term of the solicitation. By ARC's own admission, a solicitation term is material where it has more than a negligible impact on the price, quantity, quality, or delivery of the subject of the proposal. (ARC MJAR at 12 (citing *Mortg. Contracting Servs.*, 153 Fed. Cl. at 142). ARC has not shown that the secure access requirement had an integral impact on pricing, quality, quantity, or delivery. Thus, because it was not material to the solicitation, it is not likely to have been *materially* relied upon.

ARC counters that the content need not relate to a material term of the contract in order to constitute a material misrepresentation. (*See* Tr. Or. Arg. 32:17–19 (ARC Counsel: "What we're looking at in the material, is it material to the [A]gency's evaluation of the proposals.")). But that does not acknowledge ARC's burden to prove that TRANSCOM materially relied on that false statement in selecting HomeSafe's proposal for the award. Unless the SSA's decision clearly denotes that secure access requirements materially influenced this decision or the secure access requirement relates to a material contract term, the Court cannot find that it can rise to the level of a *material* misrepresentation. Therefore, whether ▮▮▮ achieved FedRAMP High compliance was not a determining factor in the Agency's award decision and cannot be a *material* misrepresentation warranting disruption of the award.

### vi.  TRANSCOM's price analysis was not arbitrary and capricious.

ARC next argues that the pricing analysis used by TRANSCOM was based on disqualified bids and therefore arbitrary. When the Agency obtained new proposals in December 2020 from ARC, HomeSafe, and CGSL, the Record states it used FAR 15.404-1(b)(2)'s first price analysis technique—comparing proposed prices. (Tab 199 at AR32395–96). But, as ARC maintains, the Agency could not have compared the December 2020 proposed prices from ARC, HomeSafe, and CGSL to each other because TRANSCOM found all December 2020 proposals unacceptable. (Tab 198 at AR31391–96 (identifying deficiencies in each proposal in each round)); *see also* FAR 15.001 (defining a "deficiency" as "a material failure . . . that increases the risk . . . to an unacceptable level"). Instead, the Agency looked back in time to its "Pre-Competitive Range Determination data" and compared ARC's, HomeSafe's, and CGSL's current prices to the prices proposed by the seven original competitors in their initial proposals from November 2019. (*Id.*). ARC claims that this method is inapplicable because those prices were found to be unacceptable. The Agency repeated this evaluation—using these static benchmarks—in each evaluation round and used the results to inform discussions. (*See generally* Tab 199).

ARC ignores that FAR part 15 does not require the United States to recalculate fair and reasonable pricing thresholds after the competitive range is set, if an offeror removes itself from the competition, or if the agency takes corrective action. *See generally* FAR 15.4. As HomeSafe notes, "normally" does not mean "mandatory," it only provides an example of when recalculation might occur. (HomeSafe MJAR at 50).

ARC fails to identify any statutory or regulatory provision that would require TRANSCOM to update its reasonable price estimates in the period between the initial RFP and final award. To evaluate a price for balance and reasonableness, the FAR prescribes a menu of "price analysis techniques and procedures." FAR 15.404-1(b)(2), 15.404-1(g)(2). These techniques and procedures include comparing a particular price to "proposed prices received in response to the solicitation." FAR 15.404-1(b)(2). Therefore, TRANSCOM adequately established a fair and reasonable price pursuant to FAR part 15. *See* FAR 15.404-1(b)(2)(i) ("Comparison of proposed prices received in response to the solicitation. Normally, adequate price competition establishes a fair and reasonable price (*see* 15.403-1(c)(1)).").

ARC argues that had TRANSCOM employed what it believes to be the correct price analysis, it would have identified ARC's price as unreasonable, thereby obligating it to hold discussions and give ARC the opportunity to make its proposal competitive. (Tr. Or. Arg. at 37:17–21). The fatal flaws to ARC's argument are that (1) ARC admits it could not have reduced its price and cannot prove prejudice, (Tab 214 at AR35367 (                                        )), and (2) this would only be compelling had ARC's price been found to be unreasonable—it was not. Therefore, any error that may have occurred in determining the reasonableness of price was not prejudicial to offerors.

> vii.  The CO's responsibility determination was rational.

ARC argues that the CO's responsibility determination brushed aside, without any rational basis, serious national security concerns raised by an outside review. ARC believes that had TRANSCOM conducted a rational responsibility determination, HomeSafe would have been eliminated from the competition or required to significantly revise its technical approach to mitigate its responsibility risks. (ARC MJAR at 35). The United States counters that TRANSCOM appropriately considered all relevant information and rationally found HomeSafe responsible. (USA MJAR (citing Tab 251 at AR37526–529.)). The Court agrees with the United States.

COs "are 'generally given wide discretion' in making responsibility determinations and in determining the amount of information that is required to make a responsibility determination." *Supreme Foodservice GmbH v. United States*, 112 Fed. Cl. 402, 415 (2013). Responsibility determinations are a matter of "business judgment" and COs are "generally given wide discretion" in making them. *Bender Shipbuilding & Repair Co. v. United States*, 297 F.3d 1358, 1362 (Fed. Cir. 2002). An agency's responsibility determination is entitled to a "presumption of regularity," and a plaintiff "necessarily bears a heavy burden" in seeking to rebut that presumption. *Impresa Construzioni*, 238 F.3d at 1338. Although the FAR requires a CO to have, or to obtain, enough information to make a responsibility determination, the contracting officer is the arbiter of the type of information he needs and the breadth of that

information. *John C. Grimberg Co., Inc. v. United States*, 185 F.3d 1297, 1303 (Fed. Cir. 1999) (citing FAR 9.105–1(a)).

Here, TRANSCOM engaged Exiger, a contractor supporting the Office of the Secretary of Defense, to provide a report so TRANSCOM could "fully assess an apparent awardee's responsibility." (Tab 268.428 at AR50465). Exiger was contracted to evaluate topics "including, but not limited to, [risk associated with] foreign ownership and control," (*id.* at AR50465, AR50457–58), in order for TRANSCOM to "do a solid assessment of the apparent awardee's responsibility," regardless of the unclassified nature of the contract, (*id.* at AR50463). Exiger produced an extensive report including risk profiles for several issues, such as foreign ownership, control, and influence, as applied to HomeSafe and its beneficiaries. (Tab 204c at AR35153–212; *see also* Tab 204d). Specifically, it identified Sun Capital Partners, a US-based private equity firm, into which numerous other funds invest capital from a range of both domestic and foreign investors. (*Id.* at AR35137). Sun Capital Partners' fund, in turn, invests money in Tier One Relocation LLC, which is one of the 50/50 joint venture partners of HomeSafe. (*Id.*). Exiger also documented that Tier One's higher-level parents presented concerns due to their "investments in high-risk jurisdictions like China or Russia," which could "create exposure and potential vulnerability to foreign intelligence targeting operations," and allow "[a] determined foreign intelligence activity" to "elicit valuable operational information from tracing the movements of U.S. military and special forces personnel around the U.S. or the world." (Tab 204c at AR35154). Based on these findings, Exiger determined that HomeSafe merited a "Medium" risk rating. (Tab 204c at AR35159). TRANSCOM found that these factors did not impact the responsibility level attributed to HomeSafe. (Tab 204 at AR34713–15).

Contrary to ARC's contentions, a Medium risk rating does not lend itself to an irresponsible rating. Exiger found that the foreign investors of Sun Capital Limited Partners are passive owners. (Tab 204c at AR35155). TRANSCOM conducted a step-by-step evaluation under FAR 9.104 to explain its responsibility determination. (*See generally* Tab 204). TRANSCOM found no nexus between Sun Capital Partners' fund, and any possible foreign-based influence, because of the wide distribution of both investors and the entities receiving investments from this fund. (*Id.* at AR34713). TRANSCOM concluded that the combination of these factors effectively eliminates any realistic possibility of foreign control or influence over Sun Capital Partners, let alone Tier One Relocation LLC, as the recipient of capital from the fund. (*Id.*). Further, the Agency concluded that "[HomeSafe] itself is even more insulated from this risk as Tier One Relocation LLC is but one of its 50/50 joint venture partners." (*Id.*). Due to the attenuation between these companies, the Agency's finding is reasonable.

ARC references vague concerns about national security risks relating to HomeSafe winning this procurement, (ARC MJAR at 37–38), but this is not a classified contract. (Tr. Or. Arg. at 45:9–10). The RFP relates to relocation services for household goods and there are no explicit aspects of this contract that implicate national security concerns. (*See* Tab 134b1 at AR21077; AR21084). If TRANSCOM believes that its interests, as well as the interests of its service members and their families, are sufficiently protected, it alone bears the risk of that decision. The Court cannot substitute its judgment for that of the Agency. Even so, there is no indication that these non-U.S. beneficial owners have any interest in, let alone a realistic opportunity to obtain, GHC data, sensitive or otherwise.

viii.  <u>Miscellaneous</u>

There are a host of other arguments offered by Plaintiffs, notably that TRANSCOM's evaluation breached its duty to consider other proposals honestly and fairly and that any violations of procurement law prejudiced the other offerors. Success on either of these arguments would necessitate a finding that a violation occurred. The Court finds no error.

Plaintiffs also request this Court to permanently enjoin the award to HomeSafe. A party seeking permanent injunctive relief must show that: (1) it "has succeeded on the merits of the case;" (2) it "will suffer irreparable harm if the court withholds injunctive relief;" (3) "the balance of hardships to the respective parties favors the grant of injunctive relief;" and (4) "it is in the public interest to grant injunctive relief." *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004). Because Plaintiffs have not succeeded on the merits of this protest, no injunctive relief is warranted.

Pursuant to RCFC 7 and 52.1, the United States moves to strike paragraphs 3–17 of a declaration, (ECF No. 78-1), that ARC submitted with its Response to the United States' Cross-Motion for Judgment on the Administrative Record. (ECF No. 85). Because the Court did not consider the Declaration in this ruling, the United States' Motion to strike is **DENIED AS MOOT**.

## III.    Conclusion

Plaintiffs have not met their burden to show that the GHC was awarded arbitrarily, capriciously, or contrary to law. Thus, the Court declines to disturb the award to HomeSafe. CGSL's and ARC's Motions for Judgment on the Administrative Record, (CGSL MJAR, ECF No. 62; ARC MJAR, ECF No. 61), are **DENIED**. The United States and HomeSafe's Motions for Judgment on the Administrative Record, (USA MJAR, ECF No. 74; HomeSafe MJAR, ECF No. 75), are **GRANTED**.

The Clerk is **DIRECTED** to enter judgment accordingly. The parties shall meet and confer and file a Joint Status Report proposing redactions to the memorandum opinion by November 14, 2022 to allow the Court to file a public version of the opinion.

**IT IS SO ORDERED.**



s/ David A. Tapp
DAVID A. TAPP, Judge